**Slip Op. 12- 108**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: The Honorable Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| and | : |
| | : |
| NUCOR CORPORATION and ARCELORMITTAL | : |
| USA LLC, | : |
| Plaintiff-Intervenors | : |
| | : |
| v. | :Consol. Court No. 11-00228 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| COMPANHIA SIDERURGICA NACIONAL, JFE | : |
| STEEL CORPORATION, KOBE STEEL, LTD., | : |
| NIPPON STEEL CORPORATION, NISSHIN | : |
| STEEL CO., LTD., and SUMITOMO METAL | : |
| INDUSTRIES, LTD., | : |
| | : |
| Defendant-Intervenors. | : |
| | : |

[The Plaintiffs' Motions for Judgment on the Agency Record are denied.  The United States International Trade Commission's Determination is affirmed. The case is dismissed.]

Dated: August 14, 2012

Skadden, Arps, Slate, Meagher & Flom, LLP, (James C. Hecht, Robert E. Lighthizer, Stephen P. Vaughn, and Stephen J. Narkin) for Plaintiff, United States Steel Corporation.

Wiley Rein, LLP, (Tessa V. Capeloto, Alan H. Price, Timothy C. Brightbill, and Maureen E. Thorson) for Plaintiff-Intervenor, Nucor Corporation.

Kelley Drye and Warren, LLP, (Kathleen W. Cannon, Paul C. Rosenthal, R. Alan Luberda, and Grace W. Kim) for Plaintiff-Intervenor, ArcelorMittal USA LLC.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant
General Counsel; Marc A. Bernstein, Office of the General Counsel,
U. S. International Trade Commission; Carrie A. Dunsmore, U.S.
Department of Justice, Commercial Litigation Branch, Civil
Division, for Defendant, United States.

Hogan Lovells US LLP, (Craig A. Lewis, Jonathan T. Stoel,and
Brian S. Janovitz), for Defendant-Intervenor Companhia Siderurgica
Nacional.

Gibson, Dunn & Crutcher, LLP, (J. Christopher Wood, Donald
Harrison, Andrea Fraser-Reid Farr, Daniel J. Plaine,and DeLisa L.
Lay) for Defendant-Intervenors JFE Steel Corporation, Kobe Steel,
Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., Sumitomo
Metal Industries.


**OPINION**

**TSOUCALAS, Senior Judge:** This matter comes before the Court upon
the Motions for Judgment on the Agency Record filed by United
States Steel Corporation ("U.S. Steel"), Nucor Corporation
("Nucor") and ArcelorMittal USA LLC ("AMUSA") (collectively
"Plaintiffs") pursuant to United States Court of International
Trade Rule 56.2. Plaintiffs challenge the final determination of
the United States International Trade Commission ("ITC") revoking
antidumping and countervailing duty orders on hot-rolled flat-
rolled steel products from Japan and Brazil. See Hot-Rolled Flat-
Rolled Carbon-Quality Steel Products from Brazil, Japan, and
Russia, 76 Fed. Reg. 34101 (June 10, 2011). Plaintiffs argue that
the final sunset determination is not supported by substantial
evidence and otherwise not in accord with the law. Plaintiffs seek
a remand of this matter for further proceedings before the ITC.

Defendant, United States, and Defendant-Intervenors, Companhia Siderurgica Nacional, JFE Steel Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd. and Sumitomo Metal Industries (collectively "Defendants"), argue that the ITC conducted a proper analysis and that its determination was supported by substantial evidence and in accord with the law.  They oppose remand of this matter.

Based on the record and oral arguments held on August 7, 2012, and for the reasons set forth below, the Court finds that the ITC's final determination was supported by substantial evidence and in accord with the law.  This matter is dismissed.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I).

## STANDARD OF REVIEW

The Court is required to "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence, or otherwise not in accord with the law."  19 U.S.C. §§ 1516a(a)(2)(B)(iii), 1516a(b)(1)(B)(i).  However, the decision of the ITC is presumed to be correct and the burden of proving otherwise rests on the party challenging the decision.  28 U.S.C. § 2639(a)(1).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951). "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted).

As long as there is an "adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and [the Federal Circuit], reviewing under the substantial evidence standard, must defer to the Commission." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006). The ITC has the "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 1008, 33 F.Supp.2d 1082, 1104 (1998), aff'd 216 F.3d 1357 (Fed. Cir. 2000). "Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of [the] evaluative process." U.S. Steel Grp. v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996). "[T]he possibility of drawing two different conclusions does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). The Court may not "displace the [ITC's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been

before it de novo." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474,

488 (1951).  Nor may the Court "reweigh the evidence or substitute

its own judgment for that of the agency." <u>Usinor v. United States</u>,

28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).

The ITC "must address significant arguments and evidence which

seriously undermines its reasoning and conclusions." <u>Altx, Inc. v.</u>

<u>United States</u>, 25 CIT 1100, 1117-18, 167 F. Supp.2d 1353, 1374

(2001).  However, the ITC is not "required to explicitly address

every piece of evidence presented by the parties, and . . . is

presumed to have considered all of the evidence on the record."

<u>Nucor Corp. v. United States</u>, 28 CIT 188, 234, 318 F. Supp. 2d

1207, 1247 (2004), <u>aff'd</u> 414 F.3d 1331 (Fed. Cir. 2005).

## BACKGROUND

Under review are the ITC's negative determinations in the

second sunset review of the antidumping and countervailing duty

orders on hot-rolled steel imports from Japan and Brazil.  <u>Hot-</u>

<u>Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,</u>

<u>Japan, and Russia</u>, 76 Fed. Reg. 34101 (June 10, 2011).

This matter arose out of the Department of Commerce's

("Commerce") various suspension agreements, antidumping orders, and

countervailing duty orders on hot-rolled steel from Brazil, Japan,

and Russia.  <u>Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel</u>

<u>Products from Japan</u>, 64 Fed. Reg. 34778 (June 29, 1999); <u>Suspension</u>

<u>of Antidumping Duty Investigation: Hot-Rolled Flat-Rolled Carbon-</u>

Quality Steel Products from Brazil, 64 Fed. Reg. 38792 (July 19, 1999); Suspension of Antidumping Duty Investigation: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation, 64 Fed. Reg. 38642 (July 19, 1999); Certain Hot-Rolled Steel Products from Brazil and Russia, Inv. Nos. 731-TA-384, 731-TA-806, 808, USITC Pub. 3223 (Aug. 1999).

In 2005, the ITC completed its first five-year administrative review, sunset review, of the orders and agreements relating to imports of hot-rolled steel from Brazil, Japan, and Russia. The ITC issued affirmative determinations for subject imports from all three countries. Certain Hot-Rolled Steel Products from Brazil, Japan, and Russia, Inv. Nos. 731-TA-384, 731-TA-806-808, USITC Pub. 3767 (Apr. 2005).

The ITC instituted its second sunset review on April 1, 2010. Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia, 75 Fed. Reg. 16504 (Int'l Trade Comm'n) (Apr. 1, 2010). The ITC reached an affirmative determination regarding subject imports from Russia, but reached negative determinations with respect to subject imports from Japan and Brazil and revoked the antidumping and countervailing duty orders previously imposed on hot-rolled steel from those countries. Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia, 76 Fed. Reg. 34101 (Int'l Trade Comm'n) (June 10, 2011).

In its findings, the ITC concluded that imports from Japan,

Brazil, and Russia were "not likely to have no discernible adverse impact" on the domestic industry in the event of revocation. <u>Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia</u>, USITC Pub. 4237, Inv. Nos. 701-TA-384 and 731-TA-806-808 (June 2011) at 12-13 ("<u>Pub. Views</u>"). The ITC further found there to be a likely reasonable overlap of competition between all subject sources and between those imports and domestic like products. <u>Id.</u> at 14-15. The ITC exercised its discretion and chose not to analyze subject imports cumulatively because it deemed imports from each subject country likely to compete under different conditions in the United States market upon revocation. <u>Id.</u> at 18. The ITC distinguished the Brazilian industry as "significantly less export oriented" and noted that imports from Brazil "historically have had a much smaller and more stable presence in the United States market than imports from the other two subject countries." <u>Id.</u> at 16-17. Japanese imports displayed different pricing patterns and a much heavier focus on the Asian market than imports from Brazil or Russia. <u>Id.</u> at 17-18.

With respect to Japan, the ITC determined that the revocation of the antidumping order would not result in any significant increase in the volume of its imports to the United States. <u>Id.</u> at 44. The ITC cited the Japanese industry's consistent and overwhelming focus on Asian markets, which are larger than the United States market and projected by the ITC to grow more quickly.

Id. at 41.  The ITC also emphasized Japan's long-term relationships with these Asian customers.  Id. at 41-42.  It noted that increases in exports from Japan to non-Asian markets during the period of review had been gradual.  Id. at 42.  The only export surge, during the time of the original injury determination, was attributed to a financial crisis that devastated demand in East Asia and remains unlikely to recur.  Id.  Additionally, although United States prices have typically exceeded those in other markets, the ITC determined that the price differences were neither sufficiently, nor consistently, large enough to provide a strong incentive for Japanese producers to divert significant quantities of exports to the United States from Asian markets.  Id. at 43.  Due to the insignificant likely volume increases, as well as the lack of any history of pervasive underselling, the ITC dismissed the likelihood of any adverse price effects or adverse impact on the domestic industry resulting from the revocation of the antidumping order on Japanese imports.  Id. at 44-45.

The ITC also determined that, upon revocation of the orders from Brazil, the subject imports were likely to be modest because of Brazil's strong home market orientation and the related economic incentives of directing shipments to their home market rather than to the United States.  Id. at 38.  They also noted a "lack of any history of import surges either to any market during the period of review or to the United States at any time since 1996."  Id.  The

ITC dismissed the likelihood that revocation of the order on Brazil would result in "significant price-depressing and -suppressing effects," or have any significant adverse impact on the condition of the domestic industry.  Id. at 39-40.  The ITC also relied on its determination that the domestic industry was not vulnerable despite its recent lackluster financial performance, because demand was expected to recover as business cycle conditions improved.  Id. at 35.

On July 6, 2011, U.S. Steel commenced this action by filing a summons with the Court.  Their complaint, filed on August 4, 2011, alleges that the ITC's negative determinations regarding imports of hot-rolled steel from Japan and Brazil were unsupported by substantial evidence and otherwise not in accord with the law.  See Compl. at 8-11.  On September 26, 2011, the Court consolidated the case initiated by U.S. Steel with those initiated by AMUSA and Nucor.

**DISCUSSION**

**Statutory Framework**

The ITC must review antidumping and countervailing duty orders every five years.  19 U.S.C. § 1675(c)(1).  During a sunset review, the ITC "shall determine whether revocation of an order . . . is likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  The Commission shall consider the likely volume, price effect, and impact of imports of

the subject merchandise on the industry if the order is revoked."

19 U.S.C. § 1675a(a)(1).

## 1. Cumulation

### A. Parties' Arguments

Nucor challenges the ITC's decision not to exercise its discretion to cumulatively analyze the effect of subject imports on the domestic industry. Mem. in Support of Nucor's Rule 56.2 Mot. for J. on the Agency R. at 7 ("Nucor Mem."). Nucor notes that the ITC determined that Japan's focus on Asian markets and Brazil's focus on its home market constituted different conditions of competition between the producers. Nucor Mem. at 12. Nucor characterizes their respective orientations as sales to "non-U.S. markets," a similarity which they allege favors cumulation. Nucor Mem. at 13. Nucor also argues that the imports from each country should be analyzed cumulatively because the ITC found that they are unlikely to have no discernible impact. Nucor Mem. at 16.

Defendants support the ITC's decision not to undertake a cumulative analysis. They maintain that reliance on differences in conditions of competition among importers from various countries is a valid justification for the exercise of the ITC's discretion in choosing not to cumulate under 19 U.S.C. § 1675a(a)(7). See Def.'s Mem. in Opp'n. to Mot. of Pls. for J. on the Agency R. at 12-13 ("Def.'s Mem."); Resp. of Japanese Producers in Opp'n to Pls.' Mots. for J. on the Agency R. at 7 ("Japanese Def.'s Resp."); Resp.

of Companhia Siderurgica Nacional in Opp'n to Pls.' Mots. for J. on

the Agency R. at 19-20 ("CSN Def.'s Resp.").

Defendants add that Nucor incorrectly collapses two conditions

of competition into one.     Japanese Def.'s Resp. at 8.

Specifically, they argue that Nucor conflates export orientation

and a heavy focus on Asian markets into a focus on non-United

States markets, whereas the ITC considered these factors

separately.  See Japanese Def.'s Resp. at 8-9; CSN Def.'s Resp. at

15.

## B. Cumulation Analysis

When assessing imports from several countries to determine if

material injury exists, the ITC has the statutory discretion to

cumulate the volume and effect of such imports.     19 U.S.C. §

1675a(a)(7).    However, "even if the subject imports meet the

statutory elements of cumulation, the ITC has discretion not to

cumulate them in a sunset review."   See Nucor Corp. v. United

States, 601 F.3d 1291, 1293 (Fed. Cir. 2010).     Pursuant to

statutory authority, the ITC has wide latitude in selecting the

types of factors it considers relevant in undertaking its

cumulation analysis, and in each sunset review the ITC retains its

discretion not to cumulate its analysis.    See 19 U.S.C. §

1675a(a)(7).

The ITC may exercise its discretion not to cumulate imports

where it finds imports likely to operate under differing conditions

of competition.  See Nucor Corp. v. United States, 601 F.3d 1291,
1296 (Fed. Cir. 2010).  Nucor categorizes Brazil's home-market
focus and Japan's Asian market focus as "sales to non-U.S. markets"
in an attempt to convert what the ITC deemed a distinguishing
condition of competition into a similarity which, they argue,
strongly favors cumulation.

        However, the ITC thoroughly examined and identified potential
differences in conditions of competition relating to export
orientation, historic volume trends, export market focus, and
historic pricing patterns.  Pub. Views at 16-18.  Nucor's
interpretation of each country's non-U.S. export focus does not, on
its own, require cumulation.  The Court may not "displace the
[ITC's] choice between two fairly conflicting views, even though
the court would justifiably have made a different choice had the
matter been before it de novo."  Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951).  Therefore, the ITC's discretion not to
cumulate is supported by substantial evidence and in accord with
the law.

## 2. Likely Volume of Subject Imports from Japan and Brazil

### A. Parties' Arguments

        Plaintiffs allege that the ITC's determination that Japan
would maintain its focus on home and Asian markets and would not
export to the United States in significant quantities is
unsupported by substantial evidence.  Mot. of Pl. United States

Steel Corp. for J. on the Agency R., 10-11 ("U.S. Steel Mot."). They allege that Japanese producers have the ability, substantial export orientation (due to a weak home market), and excess capacity to significantly increase exports to the United States Id. at 10. Plaintiffs further claim that the ITC has presented insufficient evidence that the Asian market will be able to absorb Japan's excess capacity and note that Asian production is exceeding consumption.  Id. at 10, 20.  Plaintiffs also contest the ITC's determination that Japanese producers will maintain their focus on Asian markets after revocation because of their long-term relationships with Asian customers.  Id. at 13-15.

    Additionally, U.S. Steel argues that the ITC's findings were predicated on erroneous projections that steel consumption in Asia would continue to grow.  Id. at 20-21.  Japanese producers' export history to Latin America, they allege, indicated a high likelihood that these producers would shift exports to the more attractive United States market upon revocation. Id. at 24.  AMUSA adds that the Japanese industry's moderate growth in non-Asian markets is not evidence that imports to the United States will be moderate, since the United States market is more comparable to a region like Asia and has historically higher prices than Latin America. ArcelorMittal USA's Mem. of Law in Support of Mot. for J. on the Agency R., 20-21, ("AMUSA Mem.").   Nucor adds that Japanese

producers were targeting new export markets outside of Asia not gradually but suddenly and aggressively. Nucor Mem. at 31.

With respect to Brazil, Nucor argues that revocation will result in dumping because Brazilian production capacity was imminently projected to increase beyond demand growth and Brazilian producers consistently undersold a portion of their production during the period of review. Id. at 33.

Defendants characterize Plaintiffs' challenges as mere attempts to relitigate contested factual issues that have already been appropriately decided by the ITC. Defendants allege that the ITC provided substantial evidence to support its projection that Japanese producers remain likely to focus predominantly on Asian export markets because the ITC specifically referenced that Asian consumption has exceeded that of North America and is also projected to grow rapidly. Def.'s Mem at 18. Defendants also note that the ITC justifiably relied on Japan's significant long-term commercial relationships within Asia because the ITC is "not required to find the existence of 'binding contracts' as a predicate to determining that the agreements and relationships in question would continue to be the strategic focus." Japanese Def.'s Resp. at 15. Moreover, they argue that these relationships are "significant investments," "pervasive and central" to the Japanese industry, and the ITC's judgment regarding the weight given to them as evidence of market focus should not be

second-guessed by the Court.   Japanese Def.'s Resp. at 15-17.
Lastly, Defendants note that Asian demand is stronger today than it
was in 1998, which increases the likelihood of Japan's continued
focus on exports to Asia.   Def.'s Mem. at 19.

Defendants do not believe that Japan's excess capacity will
result in increased exports to the United States upon revocation.
See Japanese Def.'s Resp. at 22.   They argue that Plaintiffs have
erroneously assumed that Japanese producers will prioritize full
capacity utilization regardless of market conditions, and that the
mere existence of unused capacity is equivalent to an increased
likelihood that such excess will be used to increase shipments to
the United States.   Id. at 23-24.   Defendants note that the ITC
never found that Asia would absorb all Japanese capacity nor that
Japan would likely operate at full capacity.   Def.'s Mem. at 20.
Historically, increases in Asian production and excess capacity
have not displaced Japanese exports from Asian markets, even when
those markets have continued to grow.   Japanese Def.'s Resp. at 26.

Defendants further allege that Plaintiffs fail to show a
significant and consistent history of price discrepancies favoring
the United States market.   See id. at 27-28.   While conceding that
United States prices have at times been higher than those of
Japan's or other Asian markets, defendants argue that prices have
not been higher with enough consistency to increase the likelihood
that Japanese producers would shift their export focus to a

significant extent.   Def.'s Mem. at 28-29.   Since Japanese
producers have not demonstrated a pattern of sudden export
shifting, the price differential between American and Japanese
markets would have to be considerably greater than the differential
recorded during the period of review in order to incentivize a
significant export shift to the United States.   Id.   As such,
defendants argue the relative attractiveness of United States
prices would not necessarily result in significant increases of
subject imports from Japan.   Id.

Defendants also address Plaintiffs' analogies to Latin
American markets in order to discredit Plaintiffs' increased volume
projections.   Def.'s Mem. at 19; Japanese Def.'s Resp. at 29.
Defendants emphasize the reasonableness of the ITC's finding that
Japanese producers have exhibited no recent propensity to move
significant import volumes from less attractive to more attractive
export markets.   Def.'s Mem. at 19; Japanese Def.'s Resp. at 29.
Defendants also note that the ITC found that not all markets in
Latin America were less attractive than the United States market.
Def.'s Mem. at 27.   Additionally, Defendants support the ITC's
dismissal of these comparisons on the grounds that Plaintiffs cite
to an undefined and vast region described as "Latin America" and
give no evidence of that region's common conditions of competition.
Id. at 26-27.  Defendants support the ITC's statutory discretion to

use evidence of historical export shifting trends rather than
Plaintiffs' data relating to absolute volumes. Id. at 29.

With respect to Brazil, Defendants dispute Nucor's demand
projections in that they neglect to account for the temporarily
diminished capacity of up-start steel mills opening in Brazil.
Def.'s Mem. at 39; CSN Def.'s Resp. at 35. Defendants also support
the ITC's reliance on factors weighing against increased volume
projections, including Brazil's home market orientation, strong
local demand, and historically stable export behavior. Def.'s Mem.
at 37-38; CSN Def.'s Resp. at 35-37.

## B.  Volume Analysis

The ITC provided substantial evidence in support of its
findings, with respect to global projections for production and
consumption, as well as each country's export orientation, pricing
trends, and market focus. See Pub. Views at 36-38, 40-43. The ITC
emphasized Japan's overwhelming export focus on the Asian market,
which is already the world's largest market and is experiencing
robust and continuing growth. Id. at 41. In addition to its
emphasis on that market's "size, projected dynamic growth, and
proximity to Japan", the ITC analyzed Japanese producers' long-term
relationships in the region, growth in exports to the region during
the period of review, lack of sudden export shifting or product
shifting, as well as significant changes in conditions of
competition that transpired during the period of review. Pub.

Views at 41-42.   Most notably, Asian demand has increased significantly since the financial crisis that occurred during the time of the original injury determination.  Id. at 42.   Although Asian production has increased in kind, there has been no history of displacement of Japanese imports to such markets.  Id. at 42 n.263.   Additionally, the ITC reviewed world market prices and determined that prices in the United States were not consistently higher and provided insufficient motivation for Japan to shift its export orientation.  Id. at 43.

Regarding the likelihood of import volume increases from Brazil, the ITC first noted that Brazilian producers directed at least 87.9% of shipments to the home market during each year of the period of review.  Id. at 37.   In 2010, the last year of the period of review, the home market absorbed 92.7% of the industry's capacity.   Id.   The ITC next noted that steel prices were consistently and often substantially higher in Brazil than in North America, and that steel consumption is projected to increase in Brazil.   Id.   The ITC also analyzed Brazil's inventories, history of shipments to different export markets, and potential product shifting, and found the industry unlikely to increase a significant volume of subject imports to the United States upon revocation.  Id. at 37-38.

As long as there is "adequate basis in support of the Commission's choice of evidentiary weight, [the Court], reviewing under the substantial evidence standard must defer to the Commission." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." Air Prods. & Chems., Inc. v. United States, 22 CIT 433, 442, 14 F. Supp. 2d 737, 746 (1998) (quoting Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd 894 F.2d 385 (Fed. Cir. 1990)). The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (internal quotations omitted). Here, the ITC acted within its discretion to determine which data to rely upon. Furthermore, the ITC reasonably explained its conclusions regarding likely volume imports and pointed to substantial record evidence in support of each. Pub. Views at 36-38, 40-43. As such, the ITC's determinations regarding likely import volumes from Japan and Brazil were both supported by substantial evidence and otherwise in accord with the law.

## 3. Likelihood of Price Effects

### A. Parties' Arguments

Plaintiffs allege that the ITC's price effects determinations are flawed because they are predicated on faulty volume determinations. Nucor Mem. at 38. AMUSA alleges that the price effects determination for Japan was erroneous because it compared products of mismatched price and quality. AMUSA Mem. at 28. Nucor adds that "pernicious price effects" can stem from a mixture of overselling and underselling. Nucor Mem. at 37. They dispute the ITC's position that underselling by Japanese producers must be pervasive in order to cause significant adverse price effects. Id. Nucor alleges that Brazil has the ability to undersell in the United States by considerable margins. Id. at 39.

Defendants support the ITC's findings that imports from Japan and Brazil are unlikely to result in any significant price effects. Def.'s Mem. at 30, 39. Defendants concur with the ITC's findings that insignificant volume increases were based on substantial evidence. Id. at 30-31, 39. Defendants emphasize that the legal standard only requires consideration of "significant price underselling" and "significant depressing or suppressing effect[s]" on domestic prices, and that the ITC need not consider the possible effects of mixed overselling and underselling. Japanese Def.'s Resp. at 33; see also 19 U.S.C. §§ 1675a(a)(3)(A)-(B). Defendants allege that the ITC reasonably relied on all available data. Japanese Def.'s Resp. at 33; Def.'s Mem. at 31. The statute only requires the ITC to consider pricing data for United States imports

and not pricing data for Japanese producers' import activities in other countries.  Japanese Def.'s Resp. at 33;  Def.'s Mem. at 31. Lastly, Defendants dismiss Plaintiffs' arguments regarding product mismatching as non-dispositive, given that the product comparison represented only a portion of the ITC's pricing analysis.  Japanese Def.'s Resp. at  32-33.   The ITC also examined historic pricing patterns and found no consistent underselling.  Def.'s Mem. at 31.

B. Price Effects Analysis

Plaintiffs contend that the ITC's pricing determinations are flawed because of their reliance on the related volume determinations.  However, the Court concluded above that the ITC's volume determinations were supported by substantial evidence. Therefore, this argument is moot.

Additionally, AMUSA's mismatching argument does not warrant remand because the ITC's analysis of potential underselling was broad-based.  The ITC analyzed both historic and likely pricing trends in addition to the product comparison to which AMUSA objects.  See Pub. Views at 44; see also 19 U.S.C. § 1675a(a)(3).

The ITC's assessments of the pricing evidence with respect to imports from Japan and Brazil are reasonable and adequately explained.  Pub. Views at 39, 44.  The ITC specifically discussed its conclusions regarding insignificant price effects with reference to data reflecting insignificant underselling during the original period of investigation.  Id. at 39, 44-45.  The ITC

distinguished between present market conditions in the related countries and those existing at the time of the original injury investigation. Id.  Here, the evaluation of the evidence is more than mere conjecture and the ITC's "decision is reasonably discernible to the Court." NMB Singapore Ltd. v. United States, 557 F.3d. 1316, 1319-20 (Fed. Cir. 2009).  Therefore, the ITC's pricing determination was supported by substantial evidence and otherwise in accord with the law.

**4. Vulnerability of the Domestic Industry**

A. Parties' Arguments

     Plaintiffs argue that the ITC's vulnerability analysis was flawed because it only discussed the industry's financial performance.  U.S. Steel Mot. at 29.  They allege that the ITC failed to consider other impact factors such as employment conditions, production, shipments, capacity utilization, and growth.  U.S. Steel Mot. at 29-30; AMUSA Mem. at 37.  Plaintiffs also contest the ITC's assessment of the relationship between weak demand and industry vulnerability.  U.S. Steel Mot. at 33; AMUSA Mem. at 35.  They argue that the ITC should have treated weak demand as a strong indicator of industry vulnerability.  U.S. Steel Mot. at 36; AMUSA Mem. at 35.  AMUSA adds that the ITC failed to explain its finding with reference to the original injury determinations and the relative trade and financial conditions of 1998.  AMUSA Mem. at 38.  In addition, Nucor emphasizes that the

ITC's failure to address evidence from industry questionnaires severely undermines its conclusion that United States demand was likely to improve.  Nucor Mem. at 20.

Defendants rebut Plaintiffs' contentions that the ITC's assessment focused exclusively on financial performance with reference to the ITC's discussion of "other factors" including employment, wages, and productivity within its analysis of the Russian suspension agreement.  Def.'s Mem. at 33; Japanese Def.'s Resp. at  36; CSN Def.'s Resp. at 30.  They also argue that the ITC's determinations would not be presumptively invalid even if they considered only financial performance.  CSN Def.'s Resp. at 31.  Defendants further argue that the ITC did not equate weak demand with lack of vulnerability, and that the "lackluster" performance of the domestic industry reflected demand conditions in the context of the business cycle rather than structural vulnerabilities of the industry itself.  Def.'s Mem. at 33-34. Furthermore, defendants maintain that the restructured domestic industry was healthier during the second sunset review than during the original injury determination.  Japanese Def.'s Resp. at 38. Defendants also note that the domestic industry is poised to grow in tandem with projected United States demand increases in the foreseeable future.  Japanese Def.'s Resp. at 38; CSN Def.'s Resp. at 33.

B. Vulnerability Analysis

The ITC explained its interpretation that the lackluster performance of the domestic industry reflected demand conditions in the context of the business cycle rather than structural vulnerabilities of the industry itself. Pub. Views at 26-27. The ITC provided substantial evidence that steel demand has been historically tied to broad demand trends in the national economy, and that the industry is poised to experience a recovery with projected increases in demand. Id. "[W]hen the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the [ITC] . . . to decide which . . . evidence to believe." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006).

The ITC also relied on projections of increased demand. They contrasted this demand with the demand of the original injury determination during which unique market conditions existed due to the Asian financial crisis. Pub. Views at 44. The vulnerability determination did not conflict with the original injury determination because the ITC considered changes in market conditions and projections for increased demand. The ITC also considered industry factors beyond those strictly related to financial performance. For example, the ITC's discussion of revocation of the suspension agreement with Russia considered "other factors" such as employment, wages, and productivity, and

was incorporated by reference into the ITC's discussion of revocation for Japan and Brazil.  Id. at 34.

The ITC is "not required to explicitly address every piece of evidence presented by the parties" during a sunset review.  See, e.g., Nucor Corp. v. United States, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004), aff'd 414 F.3d 1331 (Fed. Cir. 2005).  As long as "there is adequate basis in support of the Commission's choice of evidentiary weight, [this Court], reviewing under the substantial evidence standard, must defer to the Commission." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006).  Such adequate basis was provided here in the ITC's views. Therefore, the ITC's vulnerability analysis was supported by substantial evidence and in accord with the law.

## 5. Likelihood of Adverse Impact

### A. Parties' Arguments

Plaintiffs contend that the ITC's impact determinations are flawed because they relied on faulty volume, pricing, and vulnerability determinations.  AMUSA Mem. at 39-40; Nucor Mem. at 39.  Defendants believe that the volume and pricing determinations were reasonable.  Def.'s Mem. at 32, 40.

### B. Analysis

Plaintiffs' objections to the ITC's impact determinations are entirely predicated on their objections to the ITC's volume, pricing, and vulnerability analyses.  However, the volume, pricing,

**Court No. 11-00228**                                                      **Page 26**

and vulnerability determinations are supported by substantial evidence and in accord with the law.  "[Given that] the Court has already sustained the Commission's volume and price effects analyses, . . . the Court finds that the likely impact analysis is supported by substantial evidence and is otherwise in accordance with law." <u>Nucor Corp. v. United States</u>, __ CIT __, 675 F.Supp.2d 1340, 1363 (2010).  Therefore, reliance on these determinations to support an adverse impact analysis gives Plaintiffs no support for their argument.

**CONCLUSION**

In accordance with the foregoing, Plaintiffs' motion for judgment on the agency record is denied, and this matter is dismissed.


                                        ___/s/ NICHOLAS TSOUCALAS___
                                          **Nicholas Tsoucalas**
                                            **Senior Judge**



Dated: August 14, 2012
       New York, New York

**Slip Op. 12-**108

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: The Honorable Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| and | : |
| | : |
| NUCOR CORPORATION and ARCELORMITTAL | : |
| USA LLC, | : |
| Plaintiff-Intervenors | : |
| | : |
| v. | :Consol. Court No. 11-00228 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| COMPANHIA SIDERURGICA NACIONAL, JFE | : |
| STEEL CORPORATION, KOBE STEEL, LTD., | : |
| NIPPON STEEL CORPORATION, NISSHIN | : |
| STEEL CO., LTD., and SUMITOMO METAL | : |
| INDUSTRIES, LTD., | : |
| | : |
| Defendant-Intervenors. | : |
| | : |

<u>**JUDGMENT**</u>

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now, in accordance with said decision, it is hereby

**ORDERED** that Plaintiffs' Motions for Judgment on the Agency Record are denied; and it is further

**ORDERED** that this matter is dismissed.


_____/s/ NICHOLAS TSOUCALAS_____
**Nicholas Tsoucalas**
**Senior Judge**


Dated: August 14, 2012
      New York, New York